Mr. Taney, we'll begin with oral argument from you. I want to cover three topics with my principal time, the facts giving rise to Saggezza, Inc.'s viability for each of the six courts that are alleged here, the second is Arkeyo's affiliation motion, and the third is Arkeyo's 59E motion based on the evidence. I'm going to refer to Saggezza, Inc. as Saggezza, differentiating them from their subsidiaries that I'll call Saggezza, U.K. and Saggezza, India. Saggezza's fingerprints are all over the scope of this Arkeyo computer was sent at Saggezza's direction to Chicago, not the U.K., not India. That is something they admitted in their answer in this case. Their project manager testified that they wanted to use that software because it had Arkeyo's code and they wanted to use that code to help develop the replacement application. They then proceeded to set up a test lab in Chicago. Again, not in the U.K., not in India. So anytime they had to test the entire application, they were going to test that in Saggezza's offices in Chicago. They maintained that, excuse me, they maintained that test lab in Chicago for a year until Arkeyo subpoenaed, served a subpoena on them. At that point, Arkeyo was litigating against Cummins, who, you know, Arkeyo contends was a joint feeser with Saggezza. They maintained that test lab until Arkeyo subpoenaed, you know, seeking the software. Then they dismantled that test lab. The code that our expert, Dr. Ricardo Velarde, testified about, it goes into great length in terms of what the dates are on the files that comprise the software. This is a case where Saggezza, U.K., contracted with Metro in May of 2016, a full month before there was any contract. The record is clear that the bulk of the software was available as of April 8, 2016, that team members from the United States, including Josephine Yang from Saggezza, wanted to meet with Cummins, who also had their main offices at the time in Chicago, and say, hey, we have an application here that is ready to test. This is all before Saggezza, U.K.'s signed the contract or part of anything. Is there a specific part of the Arkeyo software that you contend is entitled to trade secret protection? Yes, Your Honor. Those are ten areas of functionality that are articulated in Dr. Velarde's report. Why are those not just common functionality? What makes them particularly trade secret protected, and what steps then did Arkeyo take to protect those? Sure. In this case, the customer, Metro, needed software that would interoperate with a very particular type of coin counting machine. There are other coin counting machines out there, other companies, Coinstar, De La Rue. Cummins made a machine called the MM2. Arkeyo was at the time that Arkeyo developed the software, starting in 2009 and continuing until they were terminated. They were the only company that had developed that kind of software. These are machines that require, the Cummins coin counting machine requires inputs from the graphical user interface. I'm here in the bank. I want to deposit $50 worth of coins. I'm typing things in. That's sending, the software underlying the GUI, the graphical user interface, is interacting through the middleware and interacting with the coin counting machine itself. Therefore, it has to, the vendor creating that has to acquire that knowledge, which Arkeyo had, about how to make that work. I believe that your question was, oh, and then Your Honor wanted to know, what were the measures? Well, the measures to protect, we had employees sign, you know, understood that they were under confidentiality obligations. We kept the things secret. We did not, we required Metro to keep the software confidential. We required Cummins to keep the software confidential. We did not, we had a 45 page, a 45 step configuration sequence that was known only to Arkeyo that was not published, not made available to anyone else that Arkeyo wasn't working with. This is how you configure the software. There's also base, there's a couple different types of software had to come together in this application to work. Arkeyo had base software that was installed on the computer, and then depending at various points in time, as Arkeyo went and updated the software, as Metro's needs and desires changed, that software had to change, but had to work with the base software. So Arkeyo did not make this available to members of the general public. The code was not available to members of the general public, would not have been available to Segeza, for example. Counsel, and typically in software copyright cases, a plaintiff comes forward and, you know, alleges that particular lines of code were copied, right? And the, because that's what the Copyright Act protects. Here, I don't think there's any allegations, and there have been no statements by Arkeyo's experts that there were any particular lines of code that were common between the Segeza software and the Arkeyo software. And Segeza makes much of this in their briefs. How do you respond to that? Yes, there's a line of cases in the Seventh Circuit and elsewhere that state when you have a idiosyncratic, like a footprint, or a fingerprint rather, that's in the, that's evident either in the software or otherwise, that the normal inquiry can be truncated. And here we have a situation where the version that our expert got to examine, we certainly contend it was not authentic, it was not complete. Apart from the code, there is contemporaneous artifacts of development. There are emails. There's an issues list. There's things like that that show... Did your expert undertake analysis to determine whether there were identical lines of code between the two types of software? He did. He did not find those in the version that he got to analyze. What we did also see, and that's what we found, based our case on, there's no innocent explanation when you're testing. This was software that was supposed to be independently developed. And when you're testing your software on a clean machine, we had one make model of a laptop. They wanted to go with a new Lenovo. They're using a Lenovo. Arkeyo's name and logo shows up in displays. There's no innocent explanation. Arkeyo is an arbitrary term. Its logo is an arbitrary logo. It's not a proper English noun. There are other examples underlying that, the issues list. They're quite instructive. You have a feature. So this is a coin counting machine that gets put in a lobby of a bank. And there's tellers that need to know, hey, there's something going on. You've got to get up and go over there and fix this thing. So Arkeyo's experience, they programmed in a knock. And that shows up as a bug on Segeza's list in the software that they're developing. It wasn't a bug. It was a feature. The reason that Segeza didn't know it was a feature is because they didn't create the original software that they were working with. The full bin limit issue is another issue that Arkeyo, in developing its software, so there's a mechanism for sort of letting the machine know, hey, the coins are starting to stack up in the bin here. They're not all the way full, but you're going to have, and these things are heavy, 800 pounds worth of coins, right? So Arkeyo's software, our development team, had a problem in developing that feature. It was the same feature, the same problem that Segeza encountered. And our expert says there's no innocent explanation for two software development teams working independently encountering all three of these telltale signs that the origin of the code at some point was Arkeyo's. And the spoliation motion is particularly relevant because it's clear the dates on the software do not match up. We know that they were continuing to modify the software into 2017. There's no dates past the summer of 2016 in the code that we got to use. Those don't match up. Those raise issues of authenticity. So that is a significant part of the story here on the analysis of the software. The trade secret, one of the things that the Defend Trade Secret Act prohibits is unlawful reverse engineering. So Arkeyo had a contract that specifically forbade Metro from using our software in a reverse engineering effort. And so when they violate that contractual obligation, hand the software over to Segeza, that becomes wrongful reverse engineering. So all these efforts, and the other thing that we don't see because the source code repository is not produced, if you have a feature in software on day one, hey, Arkeyo's name and logo is showing up. It's July 1st. What's going on? In a source code repository, you would say, okay, the version that was July 19th, that's where we took it out. And here's the code, and it was Joe Reynolds that put it in. It was that date, and here's what he did to effect that change. We don't see that because we don't have the software repository to enable it. What we have is a static one set of code that does not match up to the timeline. Let me ask you a question, something you just said is related to. You said Arkeyo and Metro have a contract. The contract prohibits reverse engineering. Arkeyo hands over this computer to Metro via Cummings, and then Segeza gets it, does reverse engineering. That's wrongful. That gives rise to a claim here. Am I wrong when I look at that Arkeyo-Metro contract, and I see an English choice of law clause, which explains also why you were proceeding in England, a choice of law and forum selection. Does that just not matter here at all because now you're suing Segeza? The thing is, with the example you just gave, the obligation not to reverse engineer, that flows to Metro. You're taking that and saying Segeza is guilty of that too. Segeza knew that it was violating this obligation, that it was obtaining this information wrongfully. We did not have a contract with Segeza. We had a binding legal obligation with Metro. They did not have the right, Segeza, to that software. We did not give it to them. We did not give Metro permission. We did not say to Metro, you can show that to Segeza. So that's why we believe that the reverse engineering that went on here was wrongful. Would you like to reserve the remainder of your time? Yes, Your Honor. Very good. Thank you, Mr. Chaney. Ms. Patel, we'll turn to you now for argument on behalf of the appellee. Good morning, and may it please the court. My name is Plak Patel, and I represent the defendant, Appellee Segeza, Inc. And we move the court to affirm the district's court judgment, which correctly found Arceo's claim to be devoid of factual or legal basis. The core facts are undisputed. Arceo lost its client, Metro Bank, because its software was obsolete, running on Windows XP and Flash technology, and lacked crucial remote management features. Arceo's entire appeal is a speculative attempt to recover for a purely commercial loss that stemmed from its own failure to innovate. The district court was correct because Arceo failed on two foundational elements for every single claim that it asserts. One, Arceo produced no admissible evidence establishing the necessary legal relationship or direct involvement to hold the U.S. parent company, Segeza, Inc., liable for the acts of its foreign subsidiaries. And two, Arceo failed to meet its burden of proving any protectable IP right or any substantial similarity between the softwares. A requirement this court has correctly concluded, or the district court correctly concluded, reflected a broad deficiency of Arceo's case as it plays fast and loose with evidence. Let me just draw your attention to one thing that Mr. Taney just mentioned, which is Arceo's insignia. Popping up on this, and you all know, in your briefs, it's one computer, it's one time, but it does pop up. The logo appears on the computer running the Segeza software in 2016. Isn't there a material, factual dispute about that? And if so, why wouldn't that preclude summary judgment? Why shouldn't we take, since we have to construe everything, you know, construe the facts in favor of Arceo right now, at least on the copyright plane? So, Josh, it's important to consider the whole setup of the coin counting machine in considering this one situation. So the coin counting machine consists of two computers, one being the one that consumers access, and then it has the coin counting hardware, and then there's an onboarding computer, an administrative console within the actual coin counting machine. And that is separate from the Segeza software. The Segeza software was not loaded onto this onboard computer. It was purely on the computer that the consumers interact with. And this is what was specifically said in the document. My apologies. So the word Arceo was only appearing on the onboard computer, the administrative console, and that's unrelated to the Segeza software. And it's important to consider that this whole system, so the actual coin counting machine hardware, the administrative console, did previously have the Arceo software. And so it appearing on this computer was innocently explained by it being a vestigial artifact of the hardware previously having the Arceo software, especially when you consider what was displayed on the screen, which is Arceo's name and phone number. The record shows that Arceo conducted maintenance services on these machines via Cummins. And so it makes sense for the administrative console to show Arceo's name and number if it's showing that there's an issue with the machine that they would need to then service. Segeza never provided maintenance services for the computer. It was not involved with anything in terms of deciding the hardware or maintaining the hardware. Its role was solely limited to the Segeza software, which Arceo admits was only located on the Lenovo computer. And so really this is a red herring. And again, this goes back to the fact that, you know, even if Arceo's argument is taken as true that this is a proverbial smoking bun, this would be something that would be seen in the software. And Arceo to date has not pointed out anywhere in the Segeza software where the word Arceo appears or that there's any similarity between at all. And counsel made the contention that there's case law saying that when there's instances of fingerprints that we can do away with the analysis of substantial similarity. However, I'm not aware of any such case law, and I'm not aware of any case law that was cited as such in Arceo's brief as well. Let me turn you into another thing I'm looking at. How can we affirm the district court's denial of sanctions when the district court did not explain it? Don't we have case law that says district courts need to explain their sanctions decisions and we have to send it back when they don't do it in a way that allows for appellate review, meaningful appellate review? Here in the district court's second opinion, we have one footnote that says, oh, and I did look at that, I did consider plaintiff's argument, that defendant had spoilated evidence that plaintiff deemed relevant to its claims and concluded that it lacked merit, period. And so the judge did put that in a footnote, but in the opinion, the judge stated that Judge Bucklow declined to do a fact-by-fact analysis because of the wholesale deficiency of Arceo's factual statements and its briefing. And then further, it made its ruling on Arceo's own admissions, which contradicted its argument regarding spoliation. And so if we look at the record, Arceo admits the fact that Segeza, India, produced the entire contents of its repository. It was a blatant admission that we produced multiple versions of the code, manuals, descriptions, the whole work product in the entire repository was produced, and Arceo admits that in its summary judgment briefing. Yet in its subsequent briefing and before this court, now it says it wasn't produced. But doesn't all that go to her decision on the merits about the spoliation issue? How does that substitute for an explanation of her sanctions decision? You know, Judge Bucklow's explanation was simply that she didn't find merit, and I do think that it goes towards the fact that the record shows that there was no merit, that Arceo itself is contradicting itself and is attempting to make arguments unsupported by the record in order to manufacture a dispute that does not exist. One of the cases cited by Arceo states that for an abuse of discretion, a decision is left unexpected when it's not apparent from the record. And so here, I believe that the district court did not commit an abuse of discretion because it's shown clearly on the record that the arguments were meritless by Arceo's own admission and also through subsequent evidence in the record, including multiple affidavits by Segeza stating that it produced multiple versions of this code, an independent production by Metro Bank of the code at issue, and verification by Segeza's expert who did actually look at the code that stated that this is a full and complete copy of the code. And of course, Arceo's own admission said it received a full copy of the source code and a full copy of the repository. But it also goes back to the issue of the relevant parties. Segeza Inc. never worked on the actual back end of the source code. The source code was not maintained by Segeza Inc. It was solely maintained by Segeza India in servers based at its location in Bangalore. And so these copies of the source code were produced by Segeza India. What Arceo has failed to establish is what obligation Segeza Inc. had to produce this software or how they would even possess this software, considering that it was not located on their servers. This was not a project that they were directly contracted to complete. This was a project that Segeza UK was contracted to make, and they subcontracted services to Segeza India and Segeza US. And Segeza India was contracted to do the actual software, the back end of the software. And so it makes sense that the source code was entirely housed by Segeza India. Segeza Inc. was merely subcontracted by Segeza UK to work on the user experience, the graphical user interface, which is just the general appearance of the software. So the animations, what a user would see when they go to the console, and the pages that they would flip through in order to get through the function of coin counting machine. And there's been no evidence to the contrary, despite Arceo's attempts to rewrite the record. In their brief, they state now that Segeza US employee Akhil Gopal Krishnan created the back end of the software. Yet in the motion for summary judgment, they admitted that Akhil Gopal Krishnan, as evidenced by his extensive testimony, only worked on the user experience, which he stated again and again, and that Shrikhappalan Gupta and Vikas Valsang from Segeza India were the employees that worked on the back end of the software. So next I do want to turn to Arceo's general discussion of the copyright plates. And so, as I mentioned before, we're not aware of any case law that indicates that Arceo can do away without showing any substantial similarity between the software. This case has been pending for years, and this is another, almost a third bite at the apple. And to date, Arceo still cannot show any similarity between the codes. And it admitted such in its argument. And this shows light as to why Arceo is making these foliation claims that have no basis in the record or in evidence. Because this is the only way that they can survive a motion for summary judgment. And, you know, as the district court concluded, there was no analysis of the code. There was no evidence that there was any similarity. There's no case law indicating that Arceo can do away with showing similarity. And even more so than that, Arceo has failed to establish any access to the Arceo software. It refers to an Arceo computer. You know, of course, tellingly, it does not give a make, model, serial number, any details associated with this computer. It states that this computer belonged to them, yet the record shows that this computer was taken from a Metro Bank location in Chelsea. And this is established by documents produced by Cummins, who was in charge of these locations at Metro Bank. And there's nothing in the record besides Arceo's own statement that shows that this computer was owned by anyone besides Metro Bank. But moreover, Arceo doesn't show that there's anything special about this computer that would not be to anyone else. Yes, the computer may have at one point had the Arceo software in executable format, but that's no different than someone having Instagram downloaded on their phone. That's not appropriation. It contained no source code by its own admission, and the record is devoid of any evidence of reverse engineering. There's no discussion. There's no communications working further on this tablet. In fact, the record shows that within days of receiving it, Metro Bank had made the decision to switch to an entirely different computer system, and the tablet was disregarded because the team was focused solely on a Lenovo computer on an upgraded system. By Arceo's own admissions, its software could not even work on this Lenovo computer. Arceo testified that it had tried using its software on a system besides Windows XP. It tried using its software on Windows 8.1. It tried using its software on Windows 10, and it did not work. And so once Segeza and Metro Bank pivoted to this Lenovo, which was Windows 8.1, it's uncertain how Arceo's code could have even been usable, especially on an upgraded system, based on its own admission that its code would not have worked on the system. So it's perplexing how outdated technology could have informed something that was new and upgraded. It's not a direct translation, and by Arceo's own admission, it would not have worked. Even more concerningly, Arceo's software used Flash software, which was outdated. By 2017, Adobe had already announced that it would no longer be supporting Flash. And so Segeza's software has no reference to Flash, because it does not use Flash. And so it's not a direct translation, and Arceo fails to kind of explain how these outdated technologies and this outdated code could have even been relevant to the Segeza software. So not only is there no evidence of actual access, when we look at the codes themselves, there's no substantial similarity, nor could there be substantial similarity because of the lack of congruity between the type of technology that's used. And in light of that, Arceo has now harped on this spoliation claim, despite its own admissions that the software was produced. And it made the argument that certain files were dated. However, it does not refer to what version of the Segeza software it's looking at. There was various versions worked on from March through the winter of 2017. It does not tell you what version, the base stamp of the document, and it doesn't even tell you why these file dates are important. Just because there's an older file date doesn't mean that there's a newer one. And so this wholesale lack of ability to give citations to the record is really what's commonplace in the arguments. And it's because of those two points that I urge this court to affirm the district court's ruling, that generally, one, that Arceo has produced no evidence that directly implicates Segeza, Inc., and two, that Arceo has played fast and loose with its evidence and failed to meet any burden on any respect by simply making assertions that are not supported by the record or evidence before the district court and before this court. So I think this court quotes time. Thank you, Ms. Patel. We'll now move to rebuttal argument. Mr. Chaney, from you. Thank you. Two points I want to address. If you look at what the actual email is discussing, the appearance of Arceo's name and logo, they don't mention administrative console. They also ask someone in the email chain who's from Cummins, could it be coming from the Cummins machine? No, he says. There is no Arceo source code on the Cummins machine, and there is not. So it wasn't from the administrative console that the Arceo name came up? Right. It was from the onboard computer. You will look at the emails, and administrative console does not appear. You will also see from Cummins, it's like, that's not coming from Cummins. Also, we submitted, their expert did not talk to anybody who actually did any of the coding. We submitted an affidavit from Mr. Tustin, who's in the audience, from our expert. They actually analyzed the operation of the software. They explained how the Arceo appeared. They examined it. Also say, we do not know what was on the Arceo computer because that disappeared. And your honors can look at the record. This code that we had to examine was delivered after the close of fact discovery. We had to extend the discovery schedule because they finally produced it after I confronted them. So the spoliation evidence is very real. Thank you, Mr. Chaney. Thank you, Ms. Patel. The case will be taken under advisement.